UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

QUENTRELL WILLIAMS,

        Plaintiff,

    v.                                                Case No. 19-cv-1697-bhl

BRIAN FOSTER, et al.,

        Defendants.

## ORDER SCREENING AND DISMISSING
## THE AMENDED COMPLAINT

Plaintiff Quentrell Williams, a Wisconsin state prisoner who is representing himself, filed this lawsuit under 42 U.S.C. §1983, alleging that the defendants violated his civil rights. Dkt. No. 1. The Court screened and dismissed the original complaint for violating Federal Rule of Civil Procedure 8. Dkt. No. 18. The Court concluded that Williams' 129-page complaint, with 65-pages of exhibits, 54 defendants, and more than 366 paragraphs of factual and legal assertions failed to comply with Rule 8's requirement of "short and plain" statement of his claims. *Id.* at 2. The Court instructed Williams to file an amended complaint in a concise "who, what, when, where, why" manner with a <u>maximum</u> of five typed, double-spaced pages, if he needed space in addition to the five pages available on the Court's standard prisoner complaint form. *Id.* at 3. The Court also denied Williams' emergency motion for temporary restraining order and motion for preliminary injunction. *Id.* at 3.

Williams filed an amended complaint on October 30, 2020. Dkt. No. 19. The amended complaint is 54-pages, with 16-pages of exhibits, and 68 defendants. *Id.* Williams also renewed his emergency motion for a temporary restraining order and motion for a preliminary injunction.

Dkt. No. 21. This order screens the amended complaint and dismisses the case.

## FEDERAL SCREENING STANDARD

The Prison Litigation Reform Act (PLRA) requires federal courts to screen complaints brought by prisoners seeking relief from a governmental entity or officer or employee of a governmental entity. 28 U.S.C. §1915A(a). The Court must dismiss a complaint if the prisoner raises claims that are legally "frivolous or malicious," fail to state a claim upon which relief may be granted, or seek monetary relief from a defendant who is immune from such relief. 28 U.S.C. §1915A(b). The Court applies the same standard as a motion to dismiss under Rule 12(b)(6). *See Cesal v. Moats*, 851 F.3d 714, 720 (7th Cir. 2017) (citing *Booker-El v. Superintendent, Ind. State Prison*, 668 F.3d 896, 899 (7th Cir. 2012)).

To state a claim under the federal notice-pleading standard, the complaint must include "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The complaint must contain enough facts, accepted as true, to "state a claim for relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows a court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). The Court construes liberally complaints filed by plaintiffs who are representing themselves. *See Cesal v. Moats*, 851 F.3d 714, 720 (7th Cir. 2017) (citing *Perez v. Fenoglio*, 792 F.3d 768, 776 (7th Cir. 2015)).

To state a claim 42 U.S.C. §1983, Williams must allege that someone deprived him of a right secured by the Constitution or the laws of the United States, and that whoever deprived him of this right was acting under the color of state law. *D.S. v. E. Porter Cty. Sch. Corp.*, 799 F.3d 793, 798 (7th Cir. 2015) (citing *Buchanan–Moore v. Cty. of Milwaukee*, 570 F.3d 824, 827 (7th Cir. 2009)).

# FACTUAL ALLEGATIONS

Williams is an inmate at the Waupun Correctional Institution (WCI). Dkt. No. 19. He names as defendants 68 individuals who are associated with the Wisconsin Department of Corrections (DOC) and/or WCI. *Id*. at 1-4. These individuals include Governor Tony Evers, high-ranking officials within the DOC, doctors, nurses, clinicians, psychologists, psychiatrists, security staff, and records custodians. *Id*.

Williams states that he has a long history of mental and emotional issues, including suicide attempts. Dkt. No. 19, ¶4. According to Williams, his psychological records were available to all the defendants when he arrived at WCI on April 18, 2019, "so the defendants knew or should have known of [his] mental and emotional problems and self-destructive tendencies." *Id*., ¶¶9, 217-26. Williams explains that he has been diagnosed with major depressive mood disorder, bi-polar-1, insomnia, and post-traumatic stress disorder but WCI classified him as MH-1 (rather than MH-2), so that "they don't have to do as much work" to provide mental health care. *Id*., ¶¶5, 217-26.

According to Williams, the DOC and its employees at WCI,

> "have systemic customs and/or policies that ha[ve] created a culture of: 1. deliberate indifference to serious medical needs, 2. failing to protect health and safety, 3. subjection to inhumane living conditions, 4. using excessive force, 5. violating the Americans with Disabilities Act, 6. discrimination; and 7. violating the due process clause."

*Id*., ¶1. He identifies at least thirteen different incidents, between April 26, 2019 and September 3, 2020, that allegedly violated his constitutional rights. *Id*., ¶¶10-212. The Court will give a brief summary of the defendants, claims, and basic facts surrounding each incident.

Incident #1: This incident occurred on April 26, 2019. *Id*., ¶¶10-65. It involves Thomas Nelson, Correctional Officer Grover, Correctional Officer Voight, Correctional Officer Cathy Barkhurst, Jane Doe Nurses #1-2, John Doe Correctional Officers #1-2, John Doe White Shirt Supervisor #1, and Dr. Kristina Deblanc. Williams states that he was on observation status on this

day and told most of these individuals, at different times throughout the day, that he was suicidal and needed to be placed in restraints. He also asked for his inhaler because he couldn't breathe well. These individuals were dismissive of his requests. Some made comments such as "you don't need restraints; you're already in observation status to monitory your safety." *Id.*, ¶16. Others didn't allow him to use his inhaler that day. Williams eventually found a piece of metal and engaged in self-harm throughout the day. It took three acts of self-harm before someone noticed, placed him in bed restraints, and called Dr. Deblanc. Once in restraints, the restraints were pulled too tight and caused swelling and injury to the skin around the restraints. Williams asks to proceed with claims regarding denial of mental health care, denial of medical care, and excessive force.

Incident #2: This incident occurred on April 28-29, 2019. *Id.*, ¶¶66-93. It involves Correctional Officer Dorn, John and Jane Doe Correctional Officers, Nurse Robert Weinman, Deblanc, Captain Kyle Tritt, and Correctional Officer J. Stantic. Williams states that he was in bed restraints on this day, but the restraints were too tight. The defendants yanked on his restraints with so much force that his limbs began to swell and ache. Williams also asked for his inhaler several times but was not allowed to use it. He also did not get several medications he needed. Williams states that he had to urinate while strapped in restraints, causing a puddle of urine to pool under his back and buttocks. The security mat in his cell was nearly ripped, and he did not get a security blanket, even though it was cold. Williams was also denied food. Williams asks to proceed with claims regarding excessive force, denial of medical care, and unconstitutional conditions of confinement.

Incident #3: This incident occurred between April 29, 2019 and May 6, 2019. *Id.*, ¶¶95-96. It involves Nurse Brian Taplin. Williams was in clinical observation during this time period. He told Taplin that he was denied adequate food and medical care. Taplin did nothing. Williams dropped from 175 pounds to 152 pounds during this time. Williams asks to proceed with claims

regarding his conditions of confinement and denial of medical care.

Incident #4: This incident occurred on July 2, 2019. *Id*., ¶¶97-120. It involves Dr. Jamie Engstrom, Sergeant B. Fisher, Nurse Ann York, Captain Kyle Tritt, J. Beahm, Grover, and John and Jane Doe Correctional Officers. Williams states that he was in clinical observation and he told these individuals that he needed to be placed in restraints to prevent self-harm. At the time he requested restraints, he had already cut himself once with a metal staple. These individuals didn't do anything until he cut himself a second time. There was so much blood in his cell that he could smear it all over the walls and door. He needed five sutures, but everyone kept "down-playing" the severity and extent of his injuries. Williams states that there are cameras in the observation cell, so someone should have been watching him. Williams asks to proceed with claims regarding denial of mental health care.

Incident #5: This incident occurred on August 16, 2019. *Id*., ¶¶121-34. It involves John and Jane Doe Correctional Officers, Lt. Nelson, Jane Doe Nurse #3, and Gayle Griffith. Williams states that he told these individuals that he needed to be placed in restraints to prevent self-harm. Again, they didn't do anything until he self-harmed at least twice. Even after his first self-harm attempt, they didn't search his cell for the item he used to self-harm. He was then able to use the same item to harm himself a second time. Again, Williams states that there are cameras in the observation cell that no one was watching. Again, his injuries were "down-played." Williams asks to proceed with claims regarding denial of mental health care.

Incident #6: This incident occurred on September 5, 2019. *Id*., ¶¶135-57. It involves Correctional Officer Bublitz, Correctional Officer J. Barrett, A. Felski, Correctional Officer Geseke, and Jane Doe Nurse #1. Williams states that he was in general population on this day and feeling very suicidal. These individuals knew he was suicidal because he either told them or they walked by his cell and could see that his cell window was covered. They did nothing. He could

hear them simply walking by his cell with no urgency to seek mental health care. Williams then cut himself with a piece of metal that got stuck in his arm. There was enough blood on the floor to cause him to slip around. He had to go to Waupun Memorial Hospital and get nine sutures. Williams asks to proceed with claims regarding denial of mental health care.

Incident #7: This incident occurred on February 24, 2020. *Id.*, ¶¶158-61. It involves B. Fisher. Williams told Fisher that he was suicidal and needed to be placed in restraints. Fisher refused to place him in restraints. Williams engaged in self-harm three times and needed to be taken to Waupun Memorial Hospital for medical care. Williams asks to proceed with claims regarding denial of mental health care.

Incident #8: This incident occurred on April 8, 2020. *Id.*, ¶¶162-71. It involves John and Jane Doe Correctional Officers, B. Fisher, and K. Deblanc. Williams was suicidal and asked to be placed in restraints; he stated that he had a razor. He also placed a sign outside his cell saying, "help I'm suicidal." None of these individuals did anything—he could hear people simply walking by his cell without any urgency to provide mental health care. Fisher then came to his cell and sprayed an incapacitating agent, even though Williams was not actively engaging in self-harm at that time. Williams then went to the hospital and got sutures in his arms and legs. He was placed in bed restraints once he returned from the hospital. Williams asks to proceed with claims regarding denial of mental health care and excessive force.

Incident #9: This incident occurred between June 17-18, 2020. *Id.*, ¶¶172-78. It involves John and Jane Doe Correctional Officers, Jane Doe Nurse, and John Doe White Shirt Supervisor. Williams states that he was on clinical observation on these days and had already gone to the hospital once for a suicide attempt with a razor. He told all of these individuals that he was going to attempt suicide again, after returning from the hospital. Nevertheless, they failed to put him in restraints. Williams then found another razer and cut his arm. He had to be rushed back to the

hospital a second time. Williams seeks to proceed with claims regarding denial of mental health care.

Incident #10: This incident occurred on June 25, 2020. *Id.*, ¶¶180-82. It involves John and Jane Doe Correctional Officers. Williams states that he was on clinical observation on this day. He told John and Jane Doe Correctional Officers that he found a razor in his cell and was going to attempt suicide. Williams states, "my statements were totally disregarded." He ended up slashing one of his arteries on his left wrist. He had to get a blood-transfusion at the Waupun Memorial Hospital. He seeks to proceed with claims regarding denial of mental health care.

Incident #11: This incident occurred on July 19, 2020. *Id.*, ¶¶183-89. It involves Lieutenant T. Mitchell, Nurse Ahlborg, Dr. K. Miedema, John and Jane Doe Correctional Officers, and Sergeant B. Fisher. Williams states that he was on clinical observation on this day. He showed all of these individuals (except Nurse Ahlborg and Fisher) that he had a piece of metal and said, "I would be dead or in the hospital." These individuals did nothing—they didn't remove him from his cell to search the cell or place him in restraints. Williams stood by his door, cut himself, and bled out. Later, Fisher came to his cell and used an incapacitating agent, even though Williams was not self-harming at the time. The incapacitating agent caused pain and burning but Williams was not allowed to shower off properly; he was only allowed to wash his face. He asked Mitchell and Miedema if he could take a decontamination shower, but they said no. Instead, they placed him in restraints and forced him in lay in extreme pain for over 12 hours. He seeks to proceed with claims regarding denial of mental health care and excessive force.

Incident #12: This incident occurred on July 22-23, 2020. *Id.*, ¶¶190-95. It involves John and Jane Doe Correctional Officers on Second and Third Shift, and Dr. Jamie Engstrom. Williams states that, on July 22, 2020, he told the John and Jane Doe Correctional Officers that he had strong urges to kill himself; he showed them a piece of metal he intended to use. These correctional

officers did nothing. Eventually, he stood by the door cutting himself, bleeding everywhere. No one noticed or was watching the security camera. The next day, on July 23, 2020, Dr. Engstrom finally came to his cell to assess him and found him in a pool of blood. Dr. Engstrom then took him to the nurse's station for sutures then placed him in bed restraints. Williams seeks to proceed with claims regarding denial of mental health care.

Incident #13: This incident occurred on September 3, 2020. *Id*., ¶¶196-212. It involves Nurse Ann York, Nurse Mary Moore, Correctional Officer Lambert, Clinician K. Grucbanaus, Captain Kyle Tritt, and Nurse Robert Ahlbarg. Williams states that, on this day, he engaged in self-harm using a piece of metal. His injuries were so bad that he was dizzy and could not sit up straight. Eventually, these individuals noticed and went to speak to him. They "downplayed" his injuries and refused to give him proper medical care. They said things like he was "fine" and his blood pressure "couldn't be that low." He continued to ask for better medical care because he felt worse, to no avail. Eventually, his condition worsened so significantly that he had to be taken to the hospital in an ambulance. Williams seeks to proceed with claims regarding denial of medical care.

Finally, Williams states that certain individuals are "superior defendants." *Id*., ¶238. He states that Governor Tony Evers, DOC Secretary Kevin Carr, DOC Psychological Director M. Larson, WCI Warden Brian Foster, Randall Hemp, WCI Security Director Tony Meli, Joseph Falke, and the Wisconsin Department of Corrections were responsible for the creation of and enforcement of the DOC and DAI policies and procedures that WCI staff have "manipulated" to violate this constitutional rights. He states that they are all "aware" of the purported deficiencies in the policies and procedures. Williams states that Mary Miller was his primary clinician and Torria Van Buren was the PSU supervisor at WCI. *Id*., ¶¶217-18. For relief, Williams seeks monetary damages and a variety of injunctions. Dkt. No. 19 at 37.

## LEGAL ANALYSIS

Williams asks to use Rules 18 and 20 to join all of the defendants and claims in one lawsuit because all of these incidents happened at WCI. Dkt. No. 19, ¶¶3, 216. Rule 18 allows Williams to "join, as independent or alternative claims, as many claims as it has against an opposing party." Fed. R. Civ. P. 18(a). But this rule is limited by Rule 20 which provides that defendants may be joined if "any right to relief is asserted against them…arising out of the same transaction, occurrence, or series of transactions or occurrences; *and* any question of law or fact common to *all* defendants will arise in the action." Fed. R. Civ. P. 20(a)(2). Reading Rules 18 and 20 together, Williams may join multiple defendants in a single case only if he asserts at least one claim against each defendant that arises out of the same events or incidents *and* involves questions of law or fact that are common to *all* the defendants. *See Wheeler v. Wexford Health Sources, Inc.*, 689 F.3d 680, 683 (7th Cir. 2012).

Williams identifies at least 13 different incidents with different underlying facts, 68 different defendants, and many different unrelated claims (denial of mental health care, denial of medical care, excessive force, conditions of confinement, violation of the ADA, and due process). All of the incidents occurred at WCI but that does not mean that they "arise" out of the same events or incidents. Williams attempts to connect all of these unrelated incidents by claiming that the incidents collectively show a "systemic custom and/or policy" that has created a "culture" of constitutional violations at WCI, but the Court is unable to discern any common custom or policy that ties all of these incidents together.

Ordinarily, the Court must "reject" Williams' complaint "either by severing the action into separate lawsuits or by dismissing the improperly joined defendants." *Owens v. Hinsley*, 635 F.3d 950, 952 (7th Cir. 2011) (citing Fed. R. Civ. P. 21). Here, Williams attempts to proceed on so many disparate claims against so many different, yet overlapping, defendants that "this procedure

becomes much less helpful." *See Blackshear v. Thurston*, No. 19-CV-299-JPS, 2020 WL 1689782, at *2 (E.D. Wis. Apr. 7, 2020). "The better strategy is to dismiss this case without prejudice in its entirety." *Id.* "[Williams] will then be free to file new lawsuits, should he choose, addressing the issues raised in the instant complaint." *Id.* This approach is consistent with the Seventh Circuit's instruction that unrelated claims against different defendants belong in separate lawsuits, "not only to prevent the sort of morass" produced by multi-claim, multi-defendant suits "but also to ensure that prisoners pay the required filing fees" under the PLRA. *George v. Smith*, 507 F.3d 605, 607 (7th Cir. 2007) (citing 28 U.S.C. § 1915(b), (g)). The Court notes that Williams did not comply with the Court's first screening order instructing him to file no more than ten pages total in his amended complaint, thus, giving him another opportunity to file an amended complaint would be futile. *See Bogie v. Rosenberg*, 705 F.3d 603, 608 (7th Cir. 2013) ("Leave to amend need not be granted, however, if it is clear that any amendment would be futile.)

On December 23, 2020, Williams filed a request for a "petition for writ of mandamus." Dkt. No. 23. He explains that he is in "imminent danger" of self-harm and directs the Court to his emergency motion for temporary restraining order and motion for preliminary injunction. *Id.* In his emergency motion, Williams asks the Court to either transfer him to a different institution or to a mental health facility. Dkt. No. 21, ¶4. He also asks the Court to order the DOC to:

(1) enforce certain suicide prevention protocols that are currently in place;

(2) change other suicide prevention protocols that are in place, including the requirement to "go to the back of the cell and kneel;" to be in bed restraints without independent access to the toilet; to limiting certain items in the observation cells (such as security blankets, regular mattresses, and utensils/water cups); and to keep the lights on bright in the observation cell;

(3) create new suicide prevention protocols, including routine mental health evaluations for any inmate who has a long history of mental or emotional issues; and

(4) provide "adequate" mental health care and medical care.

*Id.*, ¶¶1-7. The PLRA "enforces a point repeatedly made by the Supreme Court in cases

challenging prison conditions: prisons officials have broad administrative and discretionary authority over the institutions they manage." *See Westefer v. Neal,* 682 F.3d 679, 683 (7th Cir. 2012). The Court is not the proper authority to create broad and sweeping changes to WCI's suicide prevention protocols. Williams must direct these suggestions to prison officials. The Court will dismiss this case.

**IT IS ORDERED** that this case is **DISMISSED** without prejudice. The Court will enter judgment accordingly.

Dated at Milwaukee, Wisconsin this 15th day of January, 2021.

s/ *Brett H. Ludwig*
Brett H. Ludwig
United States District Judge